IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

FILED DEC 14 '98 CLERK

Civil Action No. 5:98-CV-934-BO(3)

| | | |
|---|---|---|
| CAROUSEL CAPITAL PARTNERS, L.P., | ) | |
| Plaintiff, | ) | |
| vs. | ) | **COMPLAINT** |
| R. HAROLD CHAPPELL, LOYALHANNA VENTURE FUND, L.P., LOYALHANNA COMMONWEALTH FUND, L.P., INTERSOUTH PARTNERS, L.P., INTERSOUTH PARTNERS II, L.P., THE SOUTHERN VENTURE FUND LIMITED PARTNERSHIP, DENNIS J. DOUGHERTY, WILLIAM F. EARTHMAN III, JAMES H. KNOWLES, JR., and ERNST & YOUNG, LLP, | ) | |
| Defendants. | ) | |

Plaintiff Carousel Capital Partners, L.P., complaining of defendants R. Harold Chappell, Loyalhanna Venture Fund, L.P., Loyalhana Commonwealth Fund, L.P., InterSouth Partners, L.P., InterSouth Partners II, L.P., The Southern Venture Fund Limited Partnership, Dennis J. Dougherty, William F. Earthman III, James H. Knowles, Jr. and Ernst & Young, LLP, alleges:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Carousel Capital Partners, L.P. ("Carousel") is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in Charlotte, North Carolina.

1648285.02
LIB: CH

SCANNED

2. Defendant R. Harold Chappell ("Chappell") is a citizen and resident of North Carolina.

3. Defendant Loyalhanna Venture Fund, L.P. ("LH Venture") is a limited partnership organized and existing under the laws of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

4. Defendant Loyalhanna Commonwealth Fund, L.P. ("LH Commonwealth") is a limited partnership organized and existing under the laws of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

5. Defendant InterSouth Partners, L.P. ("InterSouth") is a limited partnership organized and existing under the laws of the State of North Carolina with its principal place of business in Durham, North Carolina.

6. Defendant InterSouth Partners II, L.P. ("InterSouth II") is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in Durham, North Carolina.

7. Defendant Southern Venture Fund Limited Partnership ("Southern") is a limited partnership organized and existing under the laws of Tennessee, with its principal place of business in Nashville, Tennessee.

8. Defendant Dennis J. Dougherty ("Dougherty") is a citizen and resident of North Carolina. Dougherty is associated with the management of InterSouth and InterSouth II.

9. Defendant William F. Earthman III ("Earthman") is a citizen and resident of Tennessee. Earthman is associated with the management of Southern.

10. Defendant James H. Knowles, Jr. ("Knowles") is a citizen and resident of Pennsylvania. Knowles is associated with the management of LH Venture and LH Commonwealth.

11. Ernst & Young, LLP ("E&Y") is a limited liability partnership with its principal place of business in New York, New York, and with an office and place of business in Raleigh, North Carolina.

12. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, as amended (the "'34 Act"), 15 U.S.C. §78aa, as well as 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1367 (supplemental jurisdiction).

13. Venue is proper in this district and division pursuant to Section 27 of the '34 Act and 28 U.S.C. §1391(b), in that acts or transactions violating the '34 Act and the rules promulgated thereunder occurred in this district and division, and in that a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

## BACKGROUND FACTS

### 1. The Transaction in Question

14. On or about April 4, 1997 Carousel, Chappell, LH Venture, LH Commonwealth, InterSouth, InterSouth II, and Southern, along with certain other parties, including IllumElex Corporation ("IllumElex"), a North Carolina corporation with its principal place of business in Raleigh, North Carolina, entered into an agreement (the "Recapitalization Agreement").

15. Prior to the closing of the transaction documented by the Recapitalization Agreement (the "Recapitalization Transaction"), LH Venture, LH Commonwealth, InterSouth, InterSouth II and Southern (collectively, the "Venture Shareholders") and Chappell were holders

of certain shares of IllumElex common stock and other IllumElex securities amounting to percentage ownership of IllumElex as follows:

| Shareholder | Class A Common Stock | Class A Warrants | Class B Common Shares | Class B Warrants | Class B Options | Fully Diluted Shares | Ownership Percentage (Fully Diluted) Subtotal | Total |
|---|---|---|---|---|---|---|---|---|
| Loyalhanna Venture Fund | 85,889 | 16,411 | 43,649 | 76,267 | - | 222,216 | 25.9% | |
| Loyalhanna Commonwealth Fund | 51,533 | 9,847 | 26,179 | 45,759 | - | 133,318 | 15.5% | |
| Total Loyalhanna | | | | | | | | 41.4% |
| R. Harold Chappell | 180,000 | - | - | 47,999 | - | 227,999 | | 26.5% |
| Intersouth Partners | 29,730 | - | 15,110 | 36,608 | - | 81,448 | 9.5% | |
| Intersouth Partners II | 14,000 | 26,258 | 7,114 | 9,062 | - | 56,434 | 6.6% | |
| Total Intersouth Partners | | | | | | | | 16.1% |
| Southern Venture Fund | 7,158 | 52,516 | 3,638 | 18,125 | - | 81,437 | | 9.5% |
| Total Venture Funds and Chappell | | | | | | | | 93.5% |

In connection with the Recapitalization Transaction, and pursuant to the Recapitalization Agreement, the Venture Shareholders' respective ownership interests in IllumElex and a portion of Chappell's ownership interest in IllumElex were sold to IllumElex for cash, notes, and other consideration.

16. In connection with the Recapitalization Transaction, and pursuant to the Recapitalization Agreement, Carousel purchased from IllumElex for $6.6 million cash and other consideration 888,773 shares of Class A common stock, with the cash portion of the consideration used in part to finance the purchase by IllumElex of the Venture Shareholders' and a portion of Chappell's ownership interests in IllumElex.

17. After the closing of the Recapitalization Transaction, Carousel owned 82.5% of the recapitalized IllumElex.

18. Chappell retained a portion of his pre-Recapitalization Transaction ownership interest in IllumElex such that after the closing of the Recapitalization Transaction he owned 17.5% of the recapitalized IllumElex.

## 2. False Representations in Connection with the Transaction

19. In connection with the Recapitalization Transaction, and in the Recapitalization Agreement, IllumElex made certain representations to Carousel in order to induce Carousel to enter into the Recapitalization Agreement and consummate the Recapitalization Transaction.

20. In the Recapitalization Agreement, the Venture Shareholders and Chappell agreed to indemnify and hold harmless Carousel and certain other parties, including IllumElex, for certain losses arising from breaches of the representations made by IllumElex in the Recapitalization Agreement.

21. Among such representations were representations contained in Section 4.6(a) of the Recapitalization Agreement, namely that IllumElex's

> Financial Statements[1] are correct and complete in all material respects and fairly present the consolidated financial position of the Company [i.e., IllumElex] and its Subsidiaries as of the dates thereof and the results of their operations and cash flows for the periods then ended in accordance with GAAP [Generally Accepted Accounting Principles] . . .[and the] balance sheets contained in the Financial Statements fairly reflect all material liabilities of the Company and its Subsidiaries. . . .

22. Also among such representations were the representations contained in Section 4.9(c) of the Recapitalization Agreement, namely, that

> The accounts receivable of the Company and its Subsidiaries . . . constitute valid claims of the Company and its Subsidiaries, as applicable, enforceable by and in accordance with the terms of the instruments or documents creating them.

23. Also among such representations were the representations contained in Section 4.10(b) of the Recapitalization Agreement, namely, that

---

[1] Defined in Section 4.6(a) and for purposes of this Complaint as (i) its audited consolidated balance sheets as at November 30, 1996 and November 30, 1995 and the related statements of income, shareholders' equity and cash flows for the years then ended (hereinafter the "Audited Financial Statements") and (ii) its unaudited consolidated balance sheet as at February 28, 1997 and the related statements of income, shareholders' equity and cash flows for the three months then ended (hereinafter the "Unaudited Financial Statements").

To the Company's knowledge, all of the Inventory shown on the Company's unaudited balance sheet at February 28, 1997 consists of items of a quality and quantity usable in the ordinary course of business.

24. Also among such representations were the representations contained in Section 4.24 of the Recapitalization Agreement, namely, that

> The representations and warranties of the Company and the Selling Shareholders[2] in this Agreement and the written information provided by the Company and the Selling Shareholders to the Purchaser [i.e., Carousel] pursuant to the requirements of this Agreement do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statement not misleading.

25. Each of the representations contained in paragraphs 21 through 24, above, was false in that IllumElex's audited balance sheet at November 30, 1996 and 1995 and unaudited balance sheet at February 28, 1997 significantly and materially overstated the value of certain of IllumElex's assets and/or understated the value of certain of IllumElex's liabilities, including specifically

- Accounts receivable, which was significantly overstated as a result of, among other things, IllumElex's systematic failure to appropriately write off old or disputed receivables as well as receivables "short paid" by customers due to billing errors for which IllumElex was responsible;

- Work in process, which was significantly overstated as a result of, among other things, IllumElex's systematic recording of revenue without appropriate support of documentation as well as its systematic failure to appropriately write off work which it was clear would not be obtained by IllumElex or paid for by the customer;

- Inventory, which was significantly overstated as a result of, among other things, overstatement of the physical count of inventory items as well as IllumElex's systematic failure to appropriately write off obsolete inventory; and

- Accounts payable, which was significantly understated as a result of, among other things, IllumElex's recording of credit memos not received from vendors as well as the practice of writing up so-called "negative inventory" without proper support.

---

[2] Defined for purposes of the Recapitalization Agreement to include Chappell and the Venture Shareholders.

26. In addition, these misstatements had a significant and material negative impact upon IllumElex's statements of income for the twelve months ended November 30, 1996 and the three months ended February 28, 1997, respectively.

27. In addition to representations concerning its Financial Statements, IllumElex also made representations in the Recapitalization Agreement concerning its business practices, which representations were also made in order to induce Carousel to enter into the Recapitalization Agreement and consummate the Recapitalization Transaction.

28. Among such representations were the representations contained in Section 4.15(a) of the Recapitalization Agreement, namely, that

> [T]he Company and its Subsidiaries have conducted their business so as to materially comply with, and are in material compliance with, all Requirements of Law applicable to them. . . .

29. Also among such representations were the representations contained in Section 4.15(e) of the Recapitalization Agreement, namely, that

> Neither the Company nor any of its Subsidiaries is in default in any material respect under any . . . [governmental] license, permit or franchise, nor, to the Company's knowledge, does any circumstance exist which with notice or the passage of time or both would result in such default.

30. Also included among such representations were representations contained in Section 4.9(e) of the Recapitalization Agreement, namely, that

> Neither the Company nor any of its Subsidiaries . . . (i) has committed a material breach of . . . [or] (ii) is in material default under . . . any such Material Contract, nor has there occurred any event that with the passing of time or the giving of notice or both would constitute such a breach or default. . . .

31. Each of the representations contained in paragraphs 28 through 30, above, was false, in that as of April 4, 1997 IllumElex (unbeknownst and undisclosed to Carousel) had been and was engaged in the practice of selling used and/or reconditioned materials ("B-materials") to

customers without informing customers of this practice and, in fact, leading such customers to believe that the B-materials so installed were in fact new materials, in direct violation of various deceptive trade practice statutes of the various jurisdictions in which such events occurred and common law doctrines implicating fraudulent and/or deceptive trade practices, as well as IllumElex's contractual obligations to certain of its customers.

32. IllumElex's undisclosed and illegal practice of utilizing B-materials in the manner described herein also had a material effect on its Financial Statements, principally by understating its cost of goods sold thereby significantly and materially overstating its margins. As a result, the use of B-materials (and the failure to disclose such use) also rendered false IllumElex's representation (contained in Section 4.6(a) of the Recapitalization Agreement) concerning the accuracy, completeness and fairness of its Financial Statements, and also rendered false its representation contained in Section 4.24 of the Recapitalization Agreement, namely, that

> The representations and warranties of the Company and the Selling Shareholders in this Agreement and the written information provided by the Company and the Selling Shareholders to the Purchaser [i.e., Carousel] pursuant to the requirements of this Agreement do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statement not misleading.

33. The representations set forth in paragraphs 21 through 24 and paragraphs 28 through 30, above, were material to the Recapitalization Transaction, and Carousel relied upon them in connection with making its decision as to whether or not to enter into the Recapitalization Transaction.

34. The Recapitalization Agreement, containing the misrepresentations set forth in paragraph 21 through 24 and paragraphs 28 through 30, above, was signed by each of defendants Chappell, Dougherty, Earthman and Knowles.

### 3. Roles of Defendants in Connection with IllumElex

35. Prior to the closing of the Recapitalization Transaction, Chappell was a significant shareholder of IllumElex as well as its President and Chief Executive Officer, and the Chairman of its Board of Directors. Chappell acquired the company in 1985 from its original founder.

36. Prior to the closing of the Recapitalization Agreement, the Venture Shareholders were all significant shareholders of IllumElex and, pursuant to the IllumElex Shareholder Agreement and Investor Rights Agreement as well as through their representation on the IllumElex Board of Directors, possessed a significant degree of control over the operation of the company.

37. For example, pursuant to the IllumElex Shareholder Agreement, four out of seven directors were to be selected by the Venture Shareholders, with the remaining three to be selected by Chappell.

38. Of the four directors to be selected by the Venture Shareholders, one director was to be selected by LH Venture and LH Commonwealth (acting in concert); that director was defendant Knowles.

39. Another one such director was to be selected by InterSouth and InterSouth II (again acting in concert); that director was defendant Dougherty.

40. Another one such director was to be selected by Southern; that director was defendant Earthman.

41. Further, the IllumElex Investors Rights Agreement restricted IllumElex's ability, without the consent of the holders of at least 80% of its outstanding common stock, to engage in a number of transactions, including but not limited to payment of dividends; incur, create, assume or permit to exist certain indebtedness; incur, create, assume or permit to exist certain

encumbrances upon its assets; sell, lease, assign or otherwise dispose of all or a substantial part of its assets; consolidate or merge with or into any other corporation or firm; voluntarily dissolve, liquidate or wind up its affairs; and other negative covenants.

42. The IllumElex Investors Rights Agreement also required IllumElex to supply to its investors for their review within ninety (90) days after the end of IllumElex's fiscal year a balance sheet as of the end of such year and related statements of income and retained earnings and a statement of cash flows.

43. Defendants Chappell, Dougherty, Earthman and Knowles, in addition to their service upon the Board of Directors of IllumElex, also specifically served at various times upon the Audit and/or Executive Committees of the Board of Directors.

44. Defendants Chappell, Dougherty, Earthman and Knowles were all active members of the IllumElex Board of Directors, and undertook an active and "hands on" role in the management of IllumElex. Defendants Dougherty, Earthman and Knowles undertook such role both in their Board Member capacities as well as their capacities as representatives of their respective Venture Shareholders.

45. In addition, defendants Chappell, Dougherty, Earthman and Knowles were charged, as members of the Board of Directors of IllumElex, with the duty and obligation of supervising and reviewing the appropriate officers and employees of IllumElex to ensure that the financial statements of IllumElex were appropriately and accurately prepared, and such defendants, in their capacity as Directors, in fact exercised such authority in the regular course of their duties. Defendants Dougherty, Earthman and Knowles also exercised such authority in their roles as representatives of their respective Venture Shareholders.

46. For some years prior to the closing of the Recapitalization Agreement, E&Y had been retained as the independent auditor for IllumElex. E&Y, through its Raleigh, North Carolina office, conducted and performed an audit of IllumElex's financial statements as at November 30, 1995 and November 30, 1996, and for the years then ended, and issued its written opinion on the balance sheets and related statements of income, shareholders' equity and cash flows for such periods.

47. Prior to the closing of the Recapitalization Transaction, IllumElex's financial statements, together with E&Y's audit report thereon, were furnished to Carousel and were relied upon by Carousel in connection with its decision as to whether or not to enter into the Recapitalization Transaction.

48. At a point in time following the closing of the Recapitalization Transaction, E&Y was replaced as IllumElex's independent auditor by Deloitte & Touche, LLP ("D&T").

49. On or about January 20, 1998, after D&T had begun the audit of IllumElex's financial statements as at November 30, 1997, and the year then ended, E&Y sent IllumElex a draft management letter relating to the prior year's audit (i.e., November 30, 1996).

50. The draft management letter indicated E&Y's concern regarding improving IllumElex's accounting procedures and controls relating to transaction recording as follows:

> During this and previous audits, we noted significant involvement by non-accounting executives (in particular the Company's Chief Executive Officer) in accounting matters which in some cases resulted in recording of revenue or the decision not to write-off old assets without proper supporting documentation. For example, amounts were recorded in work in process inventory based on the representation of the CEO without corroborative documentation from customers such as change orders or corroborative letters. In addition, amounts remained in other receivables dating back several years with no current activity and no known supporting documentation. Our recommendation to management is to obtain documentary evidence from customers to support the recording of revenue. Also, documentary evidence should exist to support the collectibility of old receivables not written off and the realizability of other old assets. We believe the Company

would benefit from this practice in the account reconciliation process as well as the prevention of accounting errors and double postings.

51. Despite ample opportunity to communicate these findings to Carousel prior to the closing of the Recapitalization Transaction, at no time did E&Y ever express or make known to Carousel any of the information set forth in its draft management letter.

52. Each of defendants Dougherty, Earthman and Knowles either knew of or was recklessly indifferent to Chappell's inappropriate interference with accounting matters, and failed to disclose such knowledge and/or indifference to Carousel.

## CLAIMS FOR RELIEF

### First Claim for Relief: Securities Fraud Against Defendant Chappell

53. The allegations of paragraphs 1 through 52 are realleged and incorporated herein by reference.

54. The Recapitalization Agreement was signed on behalf of IllumElex by defendant Chappell.

55. The false representations made by IllumElex in the Recapitalization Agreement, set forth in paragraphs 21 through 24, above, were caused by defendant Chappell and known by him to be false, in that Chappell engaged in specific manipulations of IllumElex's accounting records and practices so as to materially overstate the value of certain of IllumElex's assets, including accounts receivable, work in process and inventory, and materially understate certain of its liabilities, including accounts payable, thereby materially inflating the price paid by Carousel for IllumElex's stock in connection with the Recapitalization Transaction.

56. The false representations made by IllumElex in the Recapitalization Agreement, set forth in paragraphs 28 through 30, above, were caused by defendant Chappell and known by him to be false, in that Chappell knew of IllumElex's practice of selling B-materials without

disclosing such practice to customers, thereby materially inflating the price paid by Carousel for IllumElex's stock in connection with the Recapitalization Transaction.

57. Chappell intended to and did deceive Carousel and induce it to enter into the Recapitalization Transaction through the use of IllumElex's false representations.

58. Carousel relied to its detriment upon the false representations of IllumElex contained within the Recapitalization Agreement in its purchase of IllumElex stock, and was unable, in the exercise of appropriate due diligence, to discover the fraud.

59. Carousel suffered damage as a result, in an amount to be proved at trial, but which is not less than $5 million.

60. In connection with the acts, conduct and scheme alleged in the Complaint, Chappell, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

61. By reason of the foregoing, Chappell violated Section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder in that he

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud Carousel in connection with its purchase of IllumElex stock with respect to the Recapitalization Transaction.

## Second Claim for Relief: Control Person Liability Against Chappell

62. The allegations of paragraphs 1 through 61 are realleged and incorporated herein by reference.

63. Corporations act through, among others, their officers, directors, agents and employees acting within the course and scope of their duties, and, accordingly, IllumElex, through the actions and inactions of Chappell as alleged in the First Claim for Relief, also violated Section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder.

64. Chappell, at the time of the wrongs alleged in this Complaint, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of IllumElex, through the ownership of voting securities, by contract, or otherwise.

65. Chappell, by virtue of his positions as a significant shareholder, Chairman of the Board of Directors, and President and Chief Executive officer of IllumElex, was, at the time of the wrongs alleged in this Complaint, a controlling person of IllumElex within the meaning of Section 20(a) of the '34 Act, 15 U.S.C. §78t(a).

66. Carousel suffered damage as a result of the violations of §10(b) of the '34 Act and Rule 10b-5 promulgated thereunder alleged in this Complaint, in an amount to be proved at trial but which is not less than $5 million.

67. Chappell is liable, jointly and severally, for such damage pursuant to Section 20(a) of the '34 Act, 15 U.S.C. §78t(a).

**Third Claim for Relief: Control Person Liability of the Venture Shareholders, Dougherty, Earthman and Knowles**

68. The allegations of paragraphs 1 through 67 are realleged and incorporated herein by reference.

69. The Venture Shareholders (i.e., LH Venture, LH Commonwealth, InterSouth, InterSouth II and Southern) and Dougherty, Earthman and Knowles, at the time of the wrongs alleged in the Complaint, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of IllumElex, by the ownership of voting securities, by contract or otherwise.

70. In connection with the acts, conduct and scheme alleged in the Complaint, the Venture Shareholders, Dougherty, Earthman and Knowles, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communication.

71. The Venture Shareholders and Dougherty, Earthman and Knowles were, at the time of the wrongs alleged in the Complaint, controlling persons of IllumElex within the meaning of Section 20(a) of the '34 Act, 15 U.S.C. §78t(a).

72. Carousel suffered damage as a result of the violations of §10(b) of the '34 Act and Rule 10b-5 promulgated thereunder alleged in this Complaint, in an amount to be proved at trial but which is not less than $5 million.

73. Venture Shareholders, Dougherty, Earthman and Knowles are liable, jointly and severally, for such damage pursuant to Section 20(a) of the '34 Act, 15 U.S.C. §78t(a).

**Fourth Claim for Relief: Contractual Indemnification Against Chappell and the Venture Shareholders**

74. The allegations of paragraphs 1 through 73 of the Complaint are realleged and incorporated by reference.

75. Section 8.1(b) of the Recapitalization Agreement states, in pertinent part, as follows:

> Company Breaches. Each Selling Shareholder[3] . . . hereby severally agrees to indemnify and hold harmless the Purchaser [i.e., Carousel], its successors, assigns and Affiliates (including the Company [i.e., IllumElex] and the Subsidiaries following the Closing Date), from and against any and all Losses[4] which the Purchaser, its successors, assigns and Affiliates, or any one or more of them, may sustain or incur, directly or indirectly, arising out of or incident to or by reason of (i) the falsity or incorrectness of any representation or warranty made by the Company in Article IV of this Agreement, . . . or (iii) the falsity or incorrectness in any material respect of any document, certificate or other agreement or instrument entered into, furnished or to be furnished by the Company pursuant to this Agreement; provided, that each Selling Shareholder's liability under this Section 8.1(b) will be limited to his or its Percentage Share of each particular Loss.

76. The representations of IllumElex set forth in paragraphs 21 through 24 and paragraphs 28 through 30, above, were all set forth in Article IV of the Recapitalization Agreement.

77. Such representations were false and/or incorrect.

78. Carousel has suffered Losses (within the meaning of the Recapitalization Agreement) as a result of the falsity and/or incorrectness of such representations, in an amount to be proved at trial but which is not less than $5 million.

---

[3] Defined for purposes of the Recapitalization Agreement to include Chappell and the Venture Shareholders.

[4] Defined for purposes of the Recapitalization Agreement to include "any and all liabilities, losses, damages, actions, suits, proceedings, claims, demands, assessments, fines, penalties, judgments, fees, costs and expenses (including reasonable accountants' and attorneys' fees), of every nature and character."

79. Each of Chappell, LH Venture, LH Commonwealth, InterSouth, InterSouth II and Southern is severally liable to Carousel for his or its portion of such Losses, as determined under and limited by the Recapitalization Agreement.

**Fifth Claim for Relief: Negligence Against E&Y**

80. The allegations of paragraphs 1 through 79 are realleged and incorporated herein by reference.

81. Shortly before the closing of the Recapitalization Transaction, E&Y issued the results of its audit of IllumElex's consolidated balance sheets as of November 30, 1996 and 1995, and the related statements of income, shareholders' equity and cash flows for the years then ended.

82. The report prepared by E&Y in connection with its audit provided an unqualified opinion that IllumElex's financial statements in all material respects fairly presented the financial position of IllumElex at November 30, 1996 and 1995 and the results of its operations and cash flows for the years then ended in conformity with GAAP.

83. In fact, however, IllumElex's audited consolidated balance sheet as of November 30, 1996 and 1995 contained material misstatement of the value of certain of its assets and its liabilities at those points in time, including, without limitation the following:

(a) Accounts receivable were significantly overstated as a result of IllumElex's failure to appropriately write off old or disputed receivables as well as receivables "short paid" by customers due to billing errors for which IllumElex was responsible;

(b) The value of work in progress was significantly overstated as a result of IllumElex's systematic recording of revenue without appropriate support of documentation as

well as its failure to appropriately write off work which it was clear would not be obtained by IllumElex or paid for the customer;

(c) The value of inventory was significantly overstated as a result of the overstatement of the physical count of inventory items as well as the IllumElex's failure to appropriately write off obsolete inventory; and

(d) Accounts payable were significantly understated as a result of IllumElex's recording of credit memos not received from vendors as well as the practice of writing up so-called "negative inventory" without appropriate support.

84. These misstatements had a significant and material negative impact upon IllumElex's statement of the income for the twelve months ended November 30, 1996.

85. At the time it prepared its audit and issued its report thereon, E&Y knew or should have known that IllumElex intended to supply Carousel with copies of IllumElex's audited financial statement for the purpose of inducing Carousel to enter into the Recapitalization Agreement and consummate the Recapitalization Transaction.

86. Carousel justifiably relied on the financial statements audited by E&Y in making its investment in IllumElex and E&Y either knew or should have known of such reliance.

87. Due to the significant and material misstatements in the audited financial statements, the actual value of IllumElex as of April 4, 1997, was at a minimum $5 million less than the value of the company as presented in the audited financial statements.

88. The misstatements in IllumElex's financial statements set forth in this Complaint were caused in part by significant involvement of non-accounting executives (in particular defendant Chappell) in accounting matters.

89. The significant involvement of non-accounting executives (in particular defendant Chappell) in accounting matters resulted in some cases in recording of revenue without proper supporting documentation.

90. For example, E&Y found in the course of its audit that amounts were recorded in work in process inventory based on the representation of defendant Chappell without corroborative documentation from customers.

91. The significant involvement of non-accounting executives (in particular defendant Chappell) in accounting matters resulted in some cases in decisions not to write off old assets without proper supporting documentation.

92. For example, E&Y found in the course of its audit that amounts remained in other receivables dating back several years with no (then) current activity and no (then) supporting documentation.

93. E&Y did not inform IllumElex of these concerns until January, 1998.

94. E&Y never informed Carousel of these concerns.

95. E&Y failed to exercise ordinary and reasonable care in auditing IllumElex's financial statements for the fiscal year ended November 30, 1996, in that

(a) E&Y failed to detect the material misstatements set forth in IllumElex's balance sheet as at November 30, 1996 and 1995;

(b) E&Y failed, prior to consummation of the Recapitalization Transaction, to inform IllumElex and/or Carousel of departures by Chappell and/or IllumElex from sound management and accounting practices known by E&Y to exist; and/or

(c) E&Y provided an unqualified opinion with respect to IllumElex's materially misstated balance sheet as at November 30, 1996 and 1995.

96. E&Y's failure to exercise ordinary and reasonable care caused the audited financial statements to contain the significant and material misstatements set forth in this Complaint.

97. As a result of the significant and material misstatements contained in the audited financial statements, Carousel has been damaged in an amount to be proved at trial but which is not less than $5 million.

98. Carousel is entitled to judgment against E&Y to compensate it for such damages.

WHEREFORE, Carousel prays:

(1) On its First Claim for Relief, for judgment against defendant Chappell in an amount to be proved at trial but which is not less than $5 million;

(2) On its Second Claim for Relief, for judgment against defendant Chappell in an amount to be proved at trial but which is not less than $5 million;

(3) On its Third Claim for Relief, for judgment against defendants LH Venture, LH Commonwealth, InterSouth, Intersouth II, Southern, Dougherty, Earthman and Knowles in an amount to be proved at trial but which is not less than $5 million;

(4) On its Fourth Claim for Relief, for judgment against defendants Chappell, LH Venture, LH Commonwealth, InterSouth, InterSouth II and Southern in accordance with their indemnification obligations as set forth in and limited by the Recapitalization Agreement;

(5) On its Fifth Claim for Relief, for judgment against E&Y in an amount to be proved at trial but which is not less than $5 million;

(6) For a trial by jury on all issues of fact;

(7) That the costs of this action, including reasonable attorneys' fees as permitted by law, and prejudgment interest as permitted by law, be taxed to defendants; and

(8) For such other and further relief as the Court may deem just and proper.

This 14th day of December, 1998.

Kiran H. Mehta
State Bar No. 11011
NationsBank Corporate Center, Suite 4200
100 North Tryon Street
Charlotte, NC 28202-4006
Telephone: 704-331-7437
Attorney for Plaintiff

Of Counsel:
Kennedy Covington Lobdell & Hickman, L.L.P.
NationsBank Corporate Center, Suite 4200
100 North Tryon Street
Charlotte, NC 28202-4006